UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Pedro M. Florez Duran

   v.    Civil No. 16-cv-148-AJ
      Opinion No. 2017 DNH 142

Environmental Soil Management, Inc.

**MEMORANDUM AND ORDER**

Plaintiff Pedro M. Florez Duran ("Florez") brings suit against his former employer, Environmental Soil Management, Inc. ("ESM"), alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et seq. and 42 U.S.C. § 1981, and a claim for wrongful discharge under New Hampshire law.  ESM moves for partial summary judgment, doc. no. 13, and Florez objects, doc. no. 14.[1]  The court held a hearing on the motion on May 26, 2017.  For the following reasons, ESM's motion is granted in part and denied in part.

**Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  "An issue is 'genuine' if it can be resolved in favor of

---

[1] ESM also filed a reply to Florez's objection.  See doc. no. 16.

either party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Xiaoyan Tang, 821 F.3d at 215 (internal quotation marks and citations omitted). At the summary judgment stage, the court "view[s] the facts in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in the nonmovant's favor . . . ." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016) (citation and quotation marks omitted). The court will not, however, credit "conclusory allegations, improbable inferences, and unsupported speculation." Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation and quotation marks omitted) cert. denied, 137 S. Ct. 627 (2017).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" Id. (citation omitted). "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Id. (citations omitted). "At a bare minimum, the evidence must be 'significantly

2

probative.'" Id. (citation omitted).  The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment."  Id.

## Background

ESM is in the business of decontamination of soil and runs a decontamination facility in Loudon, New Hampshire.  ESM hired Florez as a laborer on May 19, 2003.[2]  Florez, who is Hispanic and grew up in Cuba, speaks Spanish as his first language, and was a lawful permanent resident of the United States for the duration of his eleven-year employment with ESM.

### I. Harassment and Differential Treatment

Throughout his time with ESM, Florez was frequently harassed and physically assaulted by his fellow employees, and treated differently than his coworkers by his supervisors.  For example, Florez's coworkers called the police when they found out that Florez's car had a false inspection sticker and that he did not have a valid driver's license.  Florez was also suspended for a week without pay after he got into a physical altercation with another employee who had cursed at Florez.  In addition, Florez's coworkers intentionally injured him with a welding machine, beat him up, and threatened to kill him.

---

[2] Florez's work consisted of hand-picking objects out of soil to prepare the soil for treatment.

3

Florez felt that these actions were motivated by ESM employees' animosity toward him for being Cuban.

Florez's coworkers also frequently made specific reference to him being Cuban. Several times during the course of his employment, Florez found garbage in his locker and notes that referred to him as a "Cuban ass." His coworkers also told him on several occasions to go back to Cuba and called him a "stupid Cuban asshole."

Although Florez's supervisors were aware of all these incidents, they took little or no action to redress them. In fact, at some point, Florez's supervisors told him that any future arguments with his coworkers would his result in his termination. Florez felt he could no longer report any harassment or arguments for fear of being fired.

In addition, Florez's supervisors themselves treated him differently than his non-Cuban coworkers. For example, Florez was singled out for minor safety violations when his non-Cuban coworkers were not cited for similar violations. Further, his supervisors frequently denied his requests for time off from work, but granted his non-Cuban coworkers' requests.

II. **Florez's Termination from ESM**

On June 17, 2014, one of Florez's supervisors, an Operation Manager named Andrew Drobat, approached Florez and asked him,

"what did you tell the new guy?" Florez did not know what Drobat was referring to, and responded that he had not said anything. Drobat told Florez to "take a couple of days off while I find out what happened."

On June 19, 2014, Florez came to work to pick up his paycheck. Florez asserts that Drobat promised him a raise and told him to return to work on Monday, June 23.

Florez asserts that when he returned to work on June 23, another supervisor, General Manager Marc Aubrey, terminated him, telling him that the "other guys" did not want to work with him and that his physical safety was in danger. Florez states that he later spoke with Drobat on the telephone, and that Drobat told him that "the guys told Marc they don't want you there anymore."

### III. **Florez's Complaint with the EEOC**

On April 15, 2015, Florez filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and filed the same charge with the New Hampshire Human Rights Commission. In his EEOC charge of discrimination, Florez listed discrimination on the basis of race, national origin, and retaliation. See doc. no. 14-2 at 1. Florez also wrote in his charge of discrimination that he is "of Cuban race and nationality . . . ." Id. at 2.

5

On January 19, 2016, the EEOC issued Florez a Notice of Right to Sue. This action followed.

## Discussion

Florez brings three claims against ESM: (1) Violation of Title VII and 42 U.S.C. § 1981 for discrimination on the basis of race and national origin ("Count I"); (2) Violation of Title VII and 42 U.S.C. § 1981 for harassment/hostile work environment on the basis of race and national origin ("Count II"); and (3) Wrongful Termination ("Count III"). ESM moves for partial summary judgment on Counts I and II to the extent those claims are based on Florez's race, and moves for summary judgment on Count III in its entirety.

### I.   Title VII and § 1981 Claims

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1). Similarly, 42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons

and property as is enjoyed by white citizens . . . ."  Thus, both statutes prohibit employers from discriminating against an employee on the basis of race.

Both Title VII and § 1981 allow for a plaintiff to recover "on a hostile work environment theory when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Wilson v. Moulison N. Corp., 639 F.3d 1, 6-7 (1st Cir. 2011) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Riesgo v. Heidelberg Harris, Inc., 36 F. Supp. 2d 53, 58 (D.N.H. 1997) ("A plaintiff alleging a racially hostile work environment may bring a claim against his employer under Title VII or § 1981.").  "Title VII closely resembles § 1981 and generally applies the same analytical framework."  Dalomba v. Simonsen, No. 15-cv-272-PB, 2016 WL 1257891, at *7 n.8 (D.N.H. Mar. 30, 2016) (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999)).

ESM argues that it is entitled to summary judgment on Counts I and II, which allege violations of Title VII and § 1981, to the extent they are based on Florez's race.  ESM asserts that although Florez believes that ESM employees discriminated against him for being Cuban, Cuban is not a race.  It also asserts that, regardless, the record evidence

7

demonstrates that none of the incidents underlying Florez's claims in Count I or II is based on Florez being Cuban.

   A.   Cuban as a Race

In support of its argument that Cuban is not a race for purposes of a Title VII or § 1981 claim, ESM cites Padron v. Wal-Mart Stores, Inc., 783 F. Supp. 2d 1042 (N.D. Ill. 2011). In Padron, the district court granted the defendant's motion to dismiss plaintiffs' Title VII claim based on race because the plaintiffs alleged they were discriminated against for being Cuban. The court in Padron noted that "[u]nlike the term 'Hispanic,' 'Cuban' refers to a specific country of origin, not an ethnicity." Id. at 1048. The court held that, therefore, the plaintiffs had failed to allege a claim for racial discrimination under Title VII.

ESM's reliance on Padron is misplaced. In that case, the court's analysis focused on whether the plaintiffs' claims under Title VII based on racial discrimination were reasonably related to their EEOC charges. In their EEOC complaint, plaintiffs had checked only the box for national origin discrimination, and had listed their national origin as Cuban. The EEOC found that the defendant had discriminated against the plaintiffs on the basis of their national origin, which the EEOC described as Cuban. The Padron court held that, as such, plaintiffs' race-based

8

discrimination claim was "outside the scope of Plaintiffs' EEOC charges."  Id. at 1049.

In contrast, Florez's complaint with the EEOC asserts discrimination on the basis of both race and national origin, and he specifically states in his charge of discrimination that he is of "Cuban race and nationality."  Doc. no. 14-2 at 2.  Florez alleges in his complaint that he was harassed "due to his Cuban race and nationality . . . ."  Doc. no. 1 at ¶ 14.  Viewed in light most favorable to Florez and drawing all inferences in his favor, the record evidence could support a claim that ESM employees discriminated against Florez based on more than his having been born in Cuba, but instead based on both his place of origin and his ethnic background.  See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that "in the Title VII context, the terms [national origin, ancestry, and ethnicity] overlap as a legal matter"); Cuello-Suarez v. Autoridad de Energia Electrica de P.R., 737 F. Supp. 1243, 1248 (D.P.R. 1990) (denying motion to dismiss a race-based discrimination claim under § 1981 based on plaintiff being a citizen of the Dominican Republic because "plaintiff's race and her national origin are 'identical as a factual matter' and the pleadings and the answers to the interrogatories make it very clear that she is not only alleging discrimination on the basis of her place of origin without regard for her ethnic

9

background"). Therefore, ESM has not shown that it is entitled to summary judgment on Counts I and II on that basis.

B. Race-based Discrimination and Harassment

ESM also argues even if the court considers "Cuban" a race for purposes of Title VII and § 1981, its employees' actions toward Florez were not related to him being Cuban and, therefore, cannot support a race-based discrimination or hostile work environment claim. That is simply not the case. Florez testified at his deposition that his coworkers called him a "Cuban piece of shit" and wrote that phrase on his locker. Doc. no. 14-6 at 29. He further testified that they left a note in his locker that said "Cuban ass," id. at 35, and would tell him to go back to his country, id. at 40. Viewed generously to Florez, the record evidence supports a claim that many acts of discrimination or harassment at ESM were not "neutral," as ESM describes them, but were based on Florez being Cuban.[3]

---

[3] ESM also argues that even if the record evidence could support a race-based hostile work environment claim under Title VII and § 1981 (Count II), no reasonable jury could conclude that Florez was terminated because of racial discrimination and, therefore, ESM is entitled to summary judgment as to Count I. Even assuming without deciding that ESM is correct, Florez's discrimination claim in Count I alleges, and the record evidence, viewed favorably to Florez, shows, several incidents of racial discrimination by Florez's supervisors during the course of his employment, including being cited for minor safety violations and having his leave requests denied. Therefore, whether the record evidence could support a claim of racial

For those reasons, ESM is not entitled to summary judgment on Counts I or II.

## II. **Wrongful Termination**

In order to prevail on a wrongful termination claim under New Hampshire law, "a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that . . . the employment [was terminated] because the employee performed acts which public policy would encourage or . . . refused to perform acts which public policy would condemn." Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921–22 (1981)). "[O]rdinarily the issue of whether a public policy exists is a question for the jury, [but] at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law." Id. (internal citation omitted).

"Bad faith or malice on the part of an employer may be established under New Hampshire law where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge,

---

discrimination based on Florez's termination is not dispositive of his claim in Count I, as that claim is not based solely on Florez's termination.

11

or (iii) disparate treatment was administered to a similarly situated employee." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001) (citing Cloutier, 121 N.H. 915 at 921–22).

ESM argues that there is no evidence in the record that it terminated Florez out of bad faith, malice, or retaliation. It further argues there is no evidence that Florez was terminated for performing acts that public policy would encourage or for refusing to perform acts which public policy would condemn.

A.   Bad Faith, Malice, or Retaliation

In an attempt to meet the bad faith, malice, or retaliation element of his wrongful termination claim, Florez cites to the various harassment, physical abuse, and differential treatment by his supervisors that he allegedly suffered while at ESM. The problem for Florez, however, is that the question is not whether ESM or its employees acted with bad faith, malice, or retaliation toward him generally, but rather whether ESM terminated Florez out of bad faith, malice, or retaliation. See, e.g., Grivois v. Wentworth-Douglass Hosp., No. 12-cv-131-JL, 2014 WL 309354, at *1 (D.N.H. Jan. 28, 2014) (holding that a wrongful termination claim under New Hampshire law "turns on why the defendant fired the plaintiff").

12

The record evidence shows, and Florez does not dispute, that General Manager Aubrey terminated Florez because he felt his safety was in danger due to his coworkers' animosity towards him. Regardless of Florez's coworkers' and supervisors' motivation for their treatment of him throughout his employment, no evidence in the record suggests that Aubrey's termination decision was made in bad faith, with malice, or in an effort to retaliate against Florez. Therefore, Florez cannot meet the first element of a wrongful termination claim.

B.  Public Policy

Even if the record evidence could support the first element of a wrongful termination claim, it cannot support the second— that ESM terminated Florez for performing acts which public policy would encourage or for refusing to perform acts which public policy would condemn. Florez raises two arguments in an attempt to meet this prong.[4]

First, he asserts that his supervisors were aware that he was being threatened and, rather than addressing the situation, terminated him. In doing so, ESM "created a policy that would discourage employees from reporting when their or others' safety

---

[4] The public policy necessary for the second prong of a wrongful termination claim cannot be based on the prohibition against discrimination in Title VII. Smith v. F.W. Morse & Co., 76 F.3d 413, 429 (1st Cir. 1996).

13

was at risk because the employee whose safety was in danger would now be at risk of being terminated." Doc. no. 14-1 at 15. Even if true, however, any "policy" created by ESM in terminating Florez is not relevant to his wrongful termination claim. To survive summary judgment, there must be a disputed material fact as to whether Florez was terminated for doing something public policy would encourage or for not doing something that public policy would condemn. Even if Aubrey's termination decision discouraged future employees from reporting potential harassment or safety violations, that fact is not relevant to Florez's claim here.

Second, Florez notes that Drobat told him to take a few days off in June of 2014 to investigate a possible incident, and told Florez to return to work the following Monday. He asserts that ESM subsequently claimed in its response to Florez's EEOC complaint that Florez had quit, rather than been terminated. He argues that ESM "should not be permitted to tell Plaintiff to take a few days off and then terminate him for doing just that. This is a violation of public policy." Doc. no. 14-1 at 15.

Despite Florez's suggestion, there is no evidence in the record that Aubrey terminated Florez for taking a few days off. Instead, viewed favorably to Florez, the record evidence shows that Aubrey terminated Florez because his coworkers did not like him and because he could not guarantee Florez's safety. Thus,

14

Florez has not pointed to a genuine issue of material fact as to whether he was terminated for doing something public policy would encourage or for not doing something that public policy would condemn.[5]

Accordingly, ESM is entitled to summary judgment on Florez's wrongful termination claim.

## Conclusion

For the foregoing reasons, defendant's motion for partial summary judgment (doc. no. 13) is granted as to Count III and denied as to Counts I and II.

SO ORDERED.

_____
Andrea K. Johnstone
United States Magistrate Judge

July 18, 2017

cc:   Kathleen A. Davidson, Esq.
      Beth A. Deragon, Esq.
      Jennifer L. Parent, Esq.

---

[5] In any event, Florez does not allege in his complaint that ESM terminated him for taking time off.